FILED

1983 MAY 12 AM 8 11

CLERK
U.S. DISTRICT COURT
NORTHERN DISTRICT
TOLEDO, OHIO

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Josie Jaimes, et al.,

       Plaintiffs

Case No. C 74-68

   vs.

Lucas Metropolitan Housing
  Authority, et al.,

OPINION

       Defendants.

YOUNG, J.:

      This action was originally commenced by low income members of minority groups as a class action, seeking relief against the Lucas Metropolitan Housing Authority (LMHA), the United States Department of Housing and Urban Development (HUD), and various of their officers and agents, alleging that the defendants were failing to provide equal housing opportunity to minority and low income families.  This action is based on the Housing Act of 1937, as amended, 42 U.S.C. §1437 et seq.; the Civil Rights Acts found in 42 U.S.C. §§1981, 1982, 1983, 2000d, and 3601 et seq; the Fifth, Thirteenth, and Fourteenth Amendments to, and the Commerce Clause of, the Constitution of the United States.

      On April 5, 1975, pursuant to stipulations, the Court conditionally certified as a class,

          "all low income minority persons residing
          in the Toledo metropolitan area who, by
          reason of their race and poverty, are
          unable to secure decent, safe, and sanitary



AO 72A
(Rev. 8/82)

> housing in the Toledo metropolitan area, at
> rents or prices they can afford, without
> asistance from the Toledo [now the Lucas]
> Metropolitan Housing Authority, and who
> would like to have the opportunity to live
> in public housing in surburban communities
> outside the City of Toledo."

Although the defendants are now criticizing the definition of the class of plaintiffs, the Court is satisfied, and so finds, that it is an appropriate and proper description for the purposes of this litigation.

After considerable proceedings, the matter finally came on for hearing upon the merits on January 23, 1978.  The trial continued through January 25, and then was suspended because of a blizzard.  It resumed and was completed on January 31, 1978.

A briefing schedule was established, but extensions were granted, so that the final post-trial brief was not filed until July 11, 1978.  The briefs came to a total of two hundred fifteen (215) legal-size pages.  Several hundred exhibits were offered and received, some of them rather voluminous.

On several occasions the Court has read through the briefs, and some ten or more major decisions of the Courts of Appeals and the Supreme Court, in preparation for writing this opinion, only to be interrupted by emergency and criminal matters of the highest priority, and thus forced again and again to go back to the beginning.  This time, the Court hopes to get this opinion completed before disaster strikes again.

AO 72A
(Rev. 8/82)

During the course of trial, the Court reserved its rulings on objections to the introduction of certain exhibits. Ultimately, all of these matters were ruled upon except objections to plaintiffs' exhibit 197. The objections to this will be overruled and the exhibit received.

The Court also reserved its rulings upon the motions of the defendants for judgment in their favor made at the end of the plaintiffs' case and renewed at the conclusion of all of the evidence. These motions are now overruled, and the Court will render its decision upon the merits of the case after weighing all of the evidence received.

During the course of the proceedings in this case prior to trial, various interlocutory motions were considered and ruled upon by the Court by written memoranda. These matters require no further discussion or consideration.

This opinion will serve as the Court's findings of fact and conclusions of law. Fed. R. Civ. P. 52(a).

The named plaintiffs in the action are Josie Jaimes, Thomas Gonzales, Patricia Davis Tarrie, and Clarence Turner.

Mrs. Jaimes is of Hispanic background. For some nineteen years she had lived with her six children in the Sylvania area. All her family, social, and business relationships were in that area, which was and is home to her. However, ultimately her residence there was condemned by the Lucas County Health Department, and she was forced to vacate it. It was a two-room house, which had no running water, no toilet

facilities, defective electric wiring, and inadequate heat.
She was unable to afford any better housing in that area.  She
applied to LMHA for assistance, but they could do nothing for
her in Sylvania.  She has, since removing from her home there,
lived in three substandard housing units in racially
concentrated areas of Toledo.  She still desires to be able to
live decently where her home was.

Mr. Gonzales is in much the same situation as Mrs.
Jaimes.  For approximately twenty-two years he lived and was
employed in the Sylvania area.  He lived with his five children
in a two-room house with no running water and no toilet
facilities.  This dwelling was condemned, and he was forced to
leave it.  He tried in vain to locate a home in Sylvania at a
rent he could afford.  LMHA did nothing to help him there.  He
was forced to move into a substandard housing unit in Toledo,
which has resulted in his having serious difficulties keeping
his employment, and has cost him the loss of custody of his
children.  He still longs to return to Sylvania, where his
family, friends, and employment opportunities are, and then
perhaps to regain custody of his children.

Mrs. Tarrie is black, and had living with her at the
time this action was commenced seven children, the oldest
seventeen years of age.  She was employed until 1975, but since
then has been supported by ADC payments of $409.00 per month.
She has lived for many years in LMHA's McClinton Nunn Project,
in a three bedroom house.  This project is located in a black

impacted area of the City of Toledo. Mrs. Tarrie has annually requested transfer to a larger apartment outside the impacted area, but in vain. She cannot afford housing on the private housing market. Her apartment has been burglarized on four separate occasions, and the whole area where it is located is hazardous to her safety and that of her family and what little she still has in personal effects.

Mr. Turner did not testify, and no specific evidence was offered concerning him or his problem.

In addition to the defendant LMHA, which was originally called Toledo Metropolitan Housing Authority (TMHA), and HUD, the following individuals were joined as parties defendant: Carl Barrett was the Director of LMHA and Secretary of LMHA's Board of Commissioners. He has been succeeded in these positions by the defendant John Landry; defendants Ray J. Flory, Robert Dorrell, John W. Holland, Jr., Frank B. Daig, Jr., and Dorothy Dennis were Commissioners of LMHA at the time this action was filed. Flory, Holland, and Dorrell have since been succeeded by the defendants John Chadwell, Carlton Siegel and Maurine Layson. Defendants Carla Hills, Secretary of HUD, Don Morrow, Region V Administrator, HUD, and Paul Lydens, Area Director, Columbus Office, HUD, at the time this action was filed were succeeded by Patricia Harris as Secretary of HUD, Ronald Gatton, Region V Adminstrator, and Joseph P. Sabella, Acting Area Director, Columbus Office, HUD, by the time of trial.

The evidence in this case is voluminous and complex. While there is not too much dispute about basic facts, there is very considerable dispute about the inferences and ultimate factual conclusions that can be drawn from them. More than half of the two hundred plus pages of post-trial briefs are devoted to factual analysis. Thus it would add a great deal of length, but no particularly useful substance to this opinion were the Court to undertake a detailed analysis and weighing of the evidence. The Court has no doubt that the evidence supports its factual conclusions hereinafter stated, even though the parties will disagree with many of them.

The evidence leaves no doubt that Toledo and Lucas County are marked by a pervasive pattern of housing discrimination that still persists substantially unchanged since housing laws first began to develop in the early nineteen-thirties. Technically, of course, housing discrimination has been illegal since the adoption of Thirteenth and Fourteenth Amendments, and the Civil Rights Statutes enacted shortly thereafter.

At the time of the 1970 census, four years before this action was commenced, Lucas County had 484,370 residents. 383,818, or 79% lived in the City of Toledo. The rest lived either in unincorporated areas of the county, the incorporated cities of Sylvania, Maumee, and Oregon, or the incorporated villages of Ottawa Hills, Holland, Whitehouse, Waterville, Berkey, and Harbor View. 11.3% of the population

of Lucas County consisted of black minority persons, and approximately 3% consisted of hispanic minority persons.

Lucas County is divided into 128 census tracts. Under the City of Toledo's Housing Assistance Plans filed with its 1975-79 Community Development Block Grant Applications accepted by HUD, some areas were denominated as of Black Impaction, and some as of Minority Concentration. An area of Black Impaction is one in which the percentage of black residents is double the percentage in the county as a whole. An area of Minority Concentration is one with more than twice the county-wide percentage of black residents; more than three times the county-wide percentage of residents of hispanic extraction, or both. Areas of Minority Concentration have more than 22.6% black residents, more than 10% residents of hispanic origin, or both. Twenty census tracts are areas of Black Impaction, and thirty-five census tracts are areas of Minority Concentration. Twenty-eight census tracts have no black residents, and fifty-four census tracts have less than 1% residents who are black. More than three quarters of Lucas County's white residents live in areas that are more than 99% white. 88% of Lucas County's black residents live in Black Impacted areas.

In degree of segregation, only Cleveland and Dayton of the eight major Ohio cities rank above Toledo, and Toledo is eighth among twenty-nine major cities in the North Central States. Toledo is a racially segregated city with minority

groups heavily concentrated in limited sections of the city known as the "Southwest Corridor" or the "Black Corridor." Essentially this description covers the whole of Lucas County. It is clear from the evidence that these housing patterns cannot be satisfactorily explained away on the basis of income differentials or matters of freedom of choice.  Intentional racial discrimination over a long period of time, and unfortunately still continuing, has played, and still plays, a significant role in the concentration of minority persons in limited sections of Toledo and Lucas County.

The evidence leaves no doubt that positive steps must be taken to alter the existing patterns of racial segregation. If they are not, the present patterns will be those of the future.  Mrs. Jaimes and Mr. Gonzales will be permanently exiled from the places that are home to them.  Mrs. Tarrie will forever be condemned to remain the prey of lawless individuals, in her unpleasant and uncomfortable quarters.  The same is, of course, true of the many members of the class which they represent.  While there was no specific evidence as to the economic status of the minority residents of the segregated areas, it is a fair inference that a large percentage of the dwellers in those areas, regardless of race, fall below the poverty level.  Although much of the argument, particularly on the part of the defendants, totally ignores the question of poverty, it is entirely clear from the record that the discrimination which this action attacks is against poor

people, regardless of their race.  The suburbs are, if
anything, more hostile to the poor than they are to racial
minorities.

Basically, the plaintiffs contend that the defendants
have failed and refused to do that which the law requires of
them in two respects.  First, to develop low-cost housing
opportunities in the municipalities and unincorporated areas of
Lucas County outside the "Black Corridor," and second to
desegregate the housing projects which are owned and operated
by LMHA.  These will be dealt with in reverse order, taking up
first the segregation in LMHA's housing facilities.

When TMHA was created and began to develop housing
projects where there had been slum clearance activities, it
relied upon the now discredited "separate but equal" doctrine
to preserve the racial segregation which had so long existed.
For the first twenty years of its existence LMHA had an avowed
policy of racially segregating its housing projects.  Of its
first seven projects, four, Brand Whitlock Homes, Brand
Whitlock Extension, Albertus Brown Homes, and Port Lawrence
Homes, were for black persons.  Three, Weiler Homes, Ravine
Park Village, and Birmingham Terrace, were for white persons.

On January 8, 1953, the TMHA Board of Commissioners
ordered integration of its housing projects, but on January 23,
1953, some two weeks later, the Board adopted a resolution
withholding implementation of its first order.

On March 17, 1953, a group of minority citizens filed an action in this Court against TMHA seeking an order forcing integration. After the action was filed, on April 28, 1953, the Board adopted a resolution repealing the January 8 and January 23 resolutions, and adopted "a policy of non-segregation, commonly known as integration, in the operation and management of all its low cost housing projects."

Thereafter on June 23, 1953, Judge Frank L. Kloeb, then the Judge of this Court, ordered that the defendant carry out its resolution within four months from the date of the entry of the order in the case. _Vann v. Toledo Metropolitan Housing Authority_, 113 F. Supp. 210 (N.D. Ohio 1953).

Two things should be noted about this decision. The first is that LMHA had to be forced by litigation brought by minority individuals to develop a policy of desegregation, and to make a token integration of its housing projects. The second is that the declaration has never really been translated into action.

The originally segregated housing projects have remained essentially as they were to begin with. In part, this has been accomplished by a device known as "freedom of choice." When a person reaches the top of the list of applicants for public housing, he is offered an available unit, which he may reject for any reason or no reason. He is then offered another, which again he may arbitrarily reject. It is only after he refuses a third opportunity that he loses his place and is forced to the bottom of the list.

AO 72A
(Rev. 8/82)

It is of course well understood by those who must deal with problems of bigotry and discrimination that the noble words "freedom of choice" often are a euphemism for "racism." If the person at the top of the list of housing applications had to accept the first available unit physically suitable for his individual needs, or else be dropped to the bottom of the list, it is inconceivable that after some twenty-five years the racial complexion of LMHA's old housing projects would not at least be the same as that of the list of housing applicants, if not of the community as a whole.

In the case of Taylor v. Perini, 455 F. Supp. 1241 (N.D. Ohio 1978), which dealt with the problems of segregation in the Marion Correctional Institution of the State of Ohio, it was not until this Court rejected a petition for "freedom of choice" in dormitory arrangements, signed by practically all the inmates and staff of the prison, that desegregation was accomplished. Nor did the disasters predicted develop. There were neither riots, nor individual battles.

"Freedom" is a much abused word, but it is clear that there is no freedom to violate the law. The law clearly and unequivocally forbids discrimination. Therefore, no one is "free" to discriminate against others on a basis of race, creed, sex, age, or poverty.

The evidence in the case also is overwhelming that the defendants, since the time of the Vann decision have, by selecting sites for new housing developments either in racially

AO 72A
(Rev. 8/82)

concentrated or racially impacted areas, or in census tracts on the fringes of those areas, or that were obviously changing from non-impacted to impacted, acted in a manner which totally belies their declaration of policy. Another method of maintaining discrimination used by the defendants is the placing of housing projects for the elderly in substantially all-white census tracts. In the elderly housing projects constructed after the Vann decision, approximately ninety percent of the occupants are white.

The same is true of the leased housing developments. The defendant HUD did not set rents high enough to obtain property in non-minority tracts, and the defendant LMHA supinely accepted these unconscionably low rentals. LMHA only made one effort over the years to get higher rents, and that was not made until most of the allotment of rental units had been expended. That one effort was rejected by HUD.

The program which offered the greatest opportunity to breaking up the existing problem of housing segregation was the Section 8 Rent Supplement Program, which began in 1974. Under this program, the defendants could pay the difference between the actual rent of a particular housing unit and the rent that the prospective tenant could afford to pay. In theory, this would enable minority poor persons to rent dwelling units anywhere in the metropolitan area. In practice, this required very considerable efforts on the part of LMHA to locate rental units, and to counsel and assist housing applicants to seek out

AO 72A
(Rev. 8/82)

units for themselves, and to understand and avoid discriminatory treatment.

The evidence leave no doubt that LMHA failed miserably to do what it should have done. It made no concentrated efforts to locate housing units in areas with few or no minority residents, but merely took whatever came along without regard to location; its counselling programs were devoted only to the mechanics of the program. One counselor went so far as to tell applicants that if they encountered evidence of discrimination, they could report it to the defendants, but nothing would come of it. This was in spite of the fact that the defendants had made arrangements with the Fair Housing Center to investigate any complaints of discrimination in connection with the program. Housing applicants were not instructed to bring such complaints to the Fair Housing Center, or how to go about doing so. In fact, not a single complaint was ever made or referred to the Fair Housing Center, although it is inconceivable that no housing applicant seeking to take advantage of the Section 8 program experienced any racial discrimination.

It should also be noted that while sites were at various times acquired by LMHA which could have been developed to provide housing in areas outside the black impacted and minority concentrated areas of Toledo, several of these were abandoned without reasonable efforts being made to overcome obstacles to their development.

AO 72A
(Rev. 8/82)

In the case of the Lehman Road, Gawil, Elmdale, and South and Dale sites, LMHA invited litigation which, while it ultimately resulted in housing construction on the sites, by the long delays involved, by reason of inflation, cost the loss of 55 out of a projected 400 units.

At the time of the trial of this case, the defendants abandoned three locations, Talmadge and Laskey Road, Mellwood Court, and Rambo Lane. These sites were all in white middle-class neighborhoods of the City of Toledo. While there was some claim that the defendants were "precluded" from using the Talmadge-Laskey and Mellwood sites, no excuse or reason was ever given for abandoning the Rambo site. The conclusion most favorable to the defendants that could be drawn from these facts is that they were not aggressive in attacking discrimination. This Court is not willing to draw that conclusion. The whole function of the defendants under the law is to provide housing for the poor and disadvantaged. Their failure to do what the law requires is tantamount to willful discrimination. The Court finds their failure to disturb the status quo over a long period of years deprived the members of plaintiff class of their rights under the Constitution and laws to safe, sanitary, and decent housing. It begs the question to argue that plaintiffs are not entitled to housing in any particular place. The only place it is readily available is in the suburbs. Why else do white people with money move to the suburbs? If all are to be treated equally, the plaintiffs are entitled to do what the majority does--move to the suburbs.

The net result of all this is that the defendants'
actions totally belie their words. LMHA's declaration of a
policy of integration has, over a period of a quarter of a
century from the Vann decision to the trial of this case, left
its housing as segregated as it was to begin with. Nor can HUD
escape responsibility for LMHA's actions. It has at least as
great a duty to carry out the law as LMHA, and by its control
of the purse strings, could force LMHA to dance to its tune.
Furthermore, it has direct responsibility for its refusal to
grant LMHA's request for a realistic scale of rent allowances
under the Section 8 program. The evidence is undisputed that
the prices HUD fixed were too low to secure desirable rental
properties from private landlords.

Turning now to the other basic issue in the case,
that of the failure and refusal to develop low-cost housing
opportunities in the municipalities and unincorporated areas of
Lucas County outside the "black corridor," both the factual and
legal issues are much more difficult of resolution. This is
the part of the action of most concern to the plaintiffs Jaimes
and Gonzales and those members of the class similarly situated.

Except for the Section 8 rent subsidy program, in
order for the defendants to develop housing in the
municipalities and unincorporated areas of Lucas County outside
of the City of Toledo, it is necessary to have cooperation
agreements entered into between LMHA and the particular
governmental entity involved.

So far as the unincorporated areas of Lucas County are concerned, there is no serious problem legally in this regard, for LMHA did succeed in negotiating a cooperation agreement with Lucas County for 100 units of housing.  However, all of the housing developed under that agreement was placed in the Spencer-Sharples area, which is a westward extension of the black corridor, and the one black impacted census tract in the unincorporated area of the county.  This also happens to be an area which is very rural and plagued with poor transportation which limits access to employment and shopping facilities.

HUD is equally responsible for LMHA's problems in this particular area, for at time of trial it held title to the 46 rental units of the Bethany project.  It was then seeking to coerce LMHA into purchasing these units, which if it were done would substantially exhaust LMHA's cooperation agreement with Lucas County.

The defendants claim that they cannot force municipalities to enter into cooperation agreements, and that people have no constitutional right to live in any particular location, relying on Lindsey v. Normet, 405 U.S. 56 (1972); James v. Valtierra, 402 U.S. 137 (1971); and Mahaley v. Cuyahoga Metropolitan Housing Authority, 500 F.2d 1087 (6th Cir. 1974), cert. denied, 419 U.S. 1108 (1975).  They also argue that there are substantially more white persons than minority persons on LMHA's waiting list for housing, so that no racial discrimination is really involved in this case.

The definition of the class definitely makes this action one involving racial discrimination, but it is difficult to twist the defendants' adherence to the Puritan ethic which equates poverty with sin into any sort of virtue. Surely to discriminate against the poor, regardless of race, is abhorrent to the constitutional requirement of equal protection. As Justice Marshall says in James,

> "It is far too late in the day to contend that the Fourteenth Amendment prohibits only racial discrimination;...."

402 U.S. at 145 (Marshall, J., dissenting). From the time of Magna Carta, judges have taken oaths not to discriminate in judgment between rich and poor. Should the other branches of the government, or even the people themselves, be subject to a different rule?

This is perhaps beside the point, but a showing that discrimination is broader or more prevalent than the plaintiffs contend does not support a very strong argument that they have failed in their proof.

Granted that the defendants cannot compel the various municipalities outside of Toledo to execute cooperation agreements or to accept low-cost housing projects, the evidence shows no reason that they cannot cajole them. Admittedly, the defendants made no real effort to obtain cooperation agreements. Quite the contrary, the one attempt they made was an arrogant circular letter of invitation which both in form and in substance invited rejection. This is alluded to in the Court's

earlier memorandum filed January 14, 1977, denying the federal
defendants' motion to dismiss the complaint.  What is said
there will not be repeated here.

Defendants seek to excuse their refusal to make any
real effort to obtain cooperation agreements by saying that it
requires a great deal of work to develop such agreements, and
LMHA's staff is too small and too busy to undertake the burden.
They also assert that there is more need for housing in the
City of Toledo than LMHA can meet, and that the surburban
communities have no need for such housing.

Putting aside the obvious response that the fact that
many people in Toledo need housing does not mean that they must
be jammed into the same old slums in the central city when
there is much more open space in the suburbs, essentially these
arguments involve the old device of taking the bundle apart and
then easily breaking each stick.  The basic fallacy, and the
basic wrong, is that they maintain the ghetto for the
minorities, the poor, and the unfortunate.  Of course it might
seem that the suburbs have no need for low-cost housing,
because minorities and the poor have been systematically
excluded from them.  Their residents do not have to bear the
heavier burden of expanding municipal services and facilities
to meet the needs of a large population, because they exclude
the less fortunate.  It is a vicious circle of the poor getting
poorer and the rich getting richer.

The evidence in the case, taken as a whole, leaves no doubt that the needs of the members of the plaintiff class for decent, safe, and sanitary housing can only be met by developing such housing in the municipalities in Lucas County outside the City of Toledo, and that the defendants, individually and collectively, have failed and refused to take actions that could eliminate the old pattern of discrimination. Rather, they have intentionally made the choices, and acted in the ways, that continue to discriminate.

The Court is convinced that Mrs. Jaimes and Mr. Gonzales are not the only two poor, minority, individuals who want to make their homes in the suburbs of Toledo, but cannot do so because of entrenched patterns of discrimination, hostility and greed. The members of the class are entitled to relief in this action.

The problems of framing appropriate relief in this action are not simple. The surburban municipalities which are so much a part of the discriminatory actions involved in this case are not parties to it, nor would it be appropriate to try to bring them into the case at this stage of the proceedings. It may well be that actions will ultimately have to be taken either by members of the class of plaintiffs, the defendants, or, preferrably, both, to force the surburban municipalities to meet their responsibilities. Such actions, properly framed and prosecuted, should be successful. It cannot be that these municipalities can become walled fortresses impenetrable to minorities and the poor.

Even though the Court cannot, in framing relief, make direct orders against these municipalities or their officials, and will not attempt to do so, the plaintiffs are no less entitled to relief to the extent that the Court can frame it.

The plaintiffs' prayer for relief is elaborate. Basically, they ask that the defendants be enjoined from doing, or continuing to do, any acts which have the effect of denying equal housing opportunities or the lawful implementation of federal housing programs; that the defendants be required to prepare and submit for Court approval a plan of affirmative action which will insure dispersal of LMHA units outside of areas of minority concentration and into the municipal corporations in Lucas County outside the City of Toledo; that the defendants be required to seek cooperation agreements with such municipal corporations for the location of low-cost and minority housing therein; requiring the defendants to prepare and submit a plan of affirmative action which will insure the reduction of racial segregation within existing LMHA projects; an award of damages, both compensatory and punitive, to the plaintiffs; and an award of plaintiffs' attorneys fees, costs, and expenses in the prosecution of this action.

It is clear that the actions of the defendants have irreparably injured the rights of the plaintiffs and their class. Only by the use of the Court's equitable power can the wrongful activities of the defendants be terminated. However comfortable the majority may be with the status quo in the

suburbs, every citizen of this nation has an equal right to dreams which can be made into reality. The Court has equitable powers so that equity may be done. It will not do to withhold relief that it is within the Court's power to grant, and let old wrongs continue to fester. It should not be forgotten that where racial discrimination is involved this "[C]ourt has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." Louisiana v. United States, 380 U.S. 145, 154 (1965).

The defendants are enjoined from:

1. engaging, or continuing to engage, in any acts or practices which have the purpose or effect of denying equal housing opportunities because of poverty, race, color, religion, national origin, or sex;

2. expending any monies, selling any bonds, entering into any contracts, or taking any other steps to construct or lease low-income housing in any areas which are, or soon may be, racially impacted;

3. from failing or refusing to take any and all steps necessary, appropriate, or desirable to secure cooperation agreements from each and every municipal corporation in Lucas County which does not presently have such an agreement;

4. from failing or refusing to take all possible actions to ensure that family public housing units are constructed in each and all of the municipal corporations in Lucas County outside of the City of Toledo.

The defendants are further ordered to prepare and submit to this Court within sixty (60) days after the entry of the order in this case a comprehensive plan for the dispersal

of public housing throughout the territorial jurisdiction of
LMHA. Within the same period of time the defendants shall
prepare and submit to the Court a comprehensive plan of
affirmative action to correct the effect of past discriminatory
actions and practices. In addition, within the same time
period, the defendants shall prepare and submit to the Court a
special plan of affirmative action to reduce the racial
segregation within LMHA projects, which shall include, insofar
as possible, but not be limited to, the abandonment of the
three refusal rule for new applicants, a transfer policy which
encourages transfers to create better racial balance, the
affirmative marketing of units to applicants where acceptance
of the units would create better racial balance, and the
earlier housing of applicants on LMHA's waiting list if they
are willing to reside in a project which would have a better
racial balance if they resided in it.

In addition to the equitable relief set forth above,
it is clear that the named plaintiffs, Jaimes, Gonzales, and
Tarrie are entitled to recover compensatory damages for the
wrongs which the evidence clearly shows them to have suffered.
In determining the amount of such damages, in addition to the
economic losses shown, these plaintiffs are entitled to recover
substantial damages for the humiliation, pain, and anguish
which discrimination per se inflicts upon those who are
discriminated against. While it is not easy to place money
value on these intangible items, it is done by the finders of

fact in every action for personal injury.  Under the law, the
right not to have one's civil rights violated is so valuable
that compensatory damages "are presumed from the wrongful
deprivation of it without evidence of actual loss of money,
property, or any other valuable thing...." Seaton v. Sky
Realty Co., 491 F.2d 634, 637 (7th Cir. 1974) (quoting Wayne v.
Venable, 260 F.64, 66 (8th Cir. 1919) ).  In any event,
compensatory damages for humiliation certainly can be inferred
from the circumstances.  491 F.2d 634.  The amount of this loss
is the value that finders of fact would place on their own
rights, the amount they would consider necessary to make them
whole if they were deprived of their own right not to be
discriminated against.  The plaintiffs Jaimes and Gonzales are
entitled to compensatory damages in the sum of Seven Thousand
Two Hundred Dollars ($7,200.00) apiece, and the plaintiff
Tarrie is entitled to recover compensatory damages in the sum
of Six Thousand Dollars ($6,000.00).

Plaintiffs also seek punitive damages.  Originally
punitive damages were often called "smart money" because they
were intended to make the defendant "smart" for having
willfully and maliciously injured the plaintiff.  Later, they
were called "exemplary" damages, as the purpose was to deter
others who might be tempted to commit wrongful acts by the
example of the punishment visited upon the defendant.  Neither
of these approaches presented any difficulty in the case of
highly personal torts such as assault, trespass, or slander,

in which a high level of intentional maliciousness is clearly present. More recently, the emphasis seems to have shifted from personal malice to a perhaps quite impersonal willfulness. Obviously, in the present case it is difficult to find any personal malice against the plaintiffs or their class on the part of the defendants. However, there is no doubt that the defendants' conduct was willful. All of them, both individual and corporate, knew what they were doing, and basically knew it was wrong, even though they were only doing or continuing to do what had always been done, in spite of the efforts of the legislatures to change it. Thus, there is willfulness present, and there should be some deterrent effect if exemplary damages are granted. In those areas of the law, patent and anti-trust, for example, where willfulness statutorily requires the imposition of punitive damages, the amount of such damages is fixed at double the amount of the actual damages. The Court will, therefore, award each of the plaintiffs Jaimes and Gonzales the sum of Fourteen Thousand Four Hundred Dollars ($14,400.00) and the plaintiff Tarrie the sum of Twelve Thousand Dollars ($12,000.00) against the defendants individually and collectively as punitive damages.

In addition, the plaintiffs are entitled to recover a reasonable sum for their attorney fees and expenses in the prosecution of this action. If the parties are unable to agree upon the amount, upon application, the matter will be set for hearing to enable the Court to fix the amount.

Counsel for the plaintiffs shall draft an order in accordance with these findings and conclusions, and submit it to opposing counsel in accordance with the provisions of the Local Civil Rules.

IT IS SO ORDERED.

_____
Sr. United States District Judge

Toledo, Ohio