IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

INDIA GRAYSON, et al.,

                Plaintiff,              Case No. 3:74 CV 68

  -vs-

TOLEDO METROPOLITAN                 AMENDED
HOUSING AUTHORITY, et al.,          MEMORANDUM OPINION

                Defendant.

KATZ, J.

     A class of plaintiffs brought this action in 1974, alleging the defendants Lucas Metropolitan Housing Authority (then the Toledo Metropolitan Housing Authority) and United States Department of Housing and Urban Development were segregating minorities from non-minorities when building and doling out housing. The Court found for the plaintiffs and entered an order that mandated adherence to an Affirmative Action Plan (AAP) designed to correct these practices and undo their effects. A series of appeals and later entries served to both uphold and hone the plan's language. The Court recently approved a class substitution, entering India Grayson as a named plaintiff in lieu of Josie Jaimes, the former named plaintiff. Doc. 263. Ms. Grayson has filed a motion to modify the AAP and the Court issued an order on threshold issues, Doc. 259, clearing the way to address Ms. Grayson's motion to modify. The three parties have stipulated to certain facts upon which the Court will rely. Doc. 266. Both LMHA and HUD oppose Ms. Grayson's proposed modification.

     Ms. Grayson takes a broad look at public housing in Lucas County and asks the Court to create a new AAP that addresses the realities LMHA and HUD face today, such as the fact that some, but not full progress has been made towards racial integration; LMHA has shifted to a stronger focus on administering Section 8 (the housing choice voucher program); the racial makeup of public housing tenants has changed; and LMHA is rebuilding and repurposing inner city housing projects that were central to the original racial segregation finding. Ms. Grayson asks the Court to modify the AAP to account for and monitor progress in

this changing landscape. Only two narrow avenues exist for modifying the former judgment of the Court. First, when it created the AAP, the Court carved in a modification tool: the AAP could be modified either by agreement of the parties or when one party can show the Court that progress towards the plan's objectives is no longer being made. Second, the Court has the power under FEDERAL RULE OF CIVIL PROCEDURE 60(b) to relieve a party from a judgment for a variety of reasons, including when the prospective application of that judgment is no longer equitable. These two avenues overlap significantly, but neither party has provided the Court with authority that would indicate that to "relieve a party" could include revising a plan to impose new restrictions on that party. In other words, neither party has provided the Court with authority demonstrating that a plaintiff can move under Rule 60(b) to make a judgment more stringent upon a defendant, which is exactly what Ms. Grayson requests. Since the Court's own order has a provision for modification, the Court need not resolve the Rules question and can just apply the order's provision to determine if modification is appropriate.

By the terms of the Court's prior order, *Jaimes v. Lucas Metropolitan Housing Authority*, No. 74-68, 1985 U.S. Dist. LEXIS 12980 (December 10, 1985), Ms. Grayson, as the movant, must demonstrate that progress is not being made toward achieving the objectives of the AAP, of which there are three: reducing racial segregation in LMHA projects, remedying the effects of past discrimination, and assuring equal access to housing. *Id.* at 16. Ms. Grayson has also asked the Court to determine whether the AAP has *achieved* the Court's goals. *See e.g.*, Doc. 240 at 2; Doc. 246 at 2. In 1985, the Court said that the objective of remedying past discrimination "shall be achieved" by maintaining each family public housing location between 72.5% - 77.5% minority and 22.5% - 27.5% non-minority and each senior housing location between 47.5% - 52.5% minority and 47.5% - 52.5% non-minority. *Id.* at 16 (expressing this as a 3:1 ratio in family housing and a 1:1 ratio in elderly housing, with 2.5% variance in either direction). The record shows that, at best, five family locations and one elderly location are within these narrow bands. Doc. 266. HUD and LMHA have not moved the Court to modify or terminate the plan based on a theory that,

notwithstanding the racial makeup being outside the bands, they have met the general objectives of the plan and are entitled to termination of the plan. *See id.* ("C. The Plan shall continue until its objectives are achieved."). There is no value, then, in the Court making a concrete determination that HUD and LMHA have not met the objectives of the plan, as Ms. Grayson requests. The inquiry turns entirely on whether Ms. Grayson can show that modification of the plan is appropriate because "progress is not being made toward achieving the objectives of the Plan." *Id.*

Ms. Grayson asks the Court to create a new plan that encompasses LMHA's handling of Section 8 voucher programs. During the last two decades, HUD has shifted to favoring Section 8 vouchers as the need for public housing has increased and public housing agencies nationwide have demolished aging public housing projects without replacing them, instead moving people into voucher-based housing. Because of this, the nature of LMHA's work has changed much since Ms. Grayson's predecessor filed this case in 1974. Yet Ms. Grayson's request to include Section 8 administration in a revised AAP oversteps this Court's authority. The Court's role is limited to enforcing federal law when it must and returning authority to the locally accountable officials when it can. *Horne v. Flores*, 557 U.S. 433, 450 (2009) (analyzing the Equal Education Opportunity Act and finding that institutional reform litigation must be flexible to account for changing circumstances, but must also be keen to respecting federalism concerns and the ultimate goal of returning authority to the local governmental unit when the violation of federal law is cured); *accord United States v. Tennessee*, 615 F.3d 646, 652 (6th Cir. 2010) ("federal encroachment upon states' rights is more likely to occur in institutional reform litigation [so,] courts must take a 'flexible approach' to Rule 60(b)(5) motions addressing such decrees." (*quotations omitted*)).

In this case, the Court created the AAP because it found racial segregation in public housing projects and created a judicial solution to remedy that. "The evidence in the case also is overwhelming that the defendants, since the time of the <u>Vann</u> decision have, by selecting sites for new housing developments either in racially concentrated or racially impacted areas, or in census tracts on the fringes of those areas, or

that were obviously changing from non-impacted to impacted, acted in a manner which totally belies their declaration of [non-segregation] policy." Doc. 88 at 11-12. This Court and the Court of Appeals were aware that LMHA administered Section 8 housing, but the ultimate AAP did not include a mandate directing LMHA's Section 8 administration. Of course, the Court's original injunction included a ban on engaging in any discriminatory housing practices, and this would include LMHA's administration of Section 8 housing, but the AAP focuses exclusively on housing projects. The Court of Appeals explicitly struck provisions of the District Court's order that could have been broadly interpreted and left the more specific foundation that became the AAP and controls public housing projects. *See* Doc. 117 at 41 ("We set aside . . . the court's injunction and direction for submission of affirmative action plans, except for Part IX and paragraph a. of part VI of the trial court's judgment order and REMAND the cause for further proceedings in conformity with this opinion."). This Court of Appeals' remand led to the Court's adoption of the AAP, and that did not include a mandate for administering Section 8 voucher programs. If Ms. Grayson could show (and she has not even asserted this) that LMHA was using Section 8 vouchers in a way that worsens the segregation *in public housing projects*, then the Court could consider broadening the AAP to prevent that. But, simply noting that the Section 8 program is itself a difficult program to administer fairly does not broaden the Court's power to include the administration of Section 8 housing in the AAP. Except when a plaintiff shows a violation of federal law and the court remedies it with an order (*see, e.g. Horne*, 557 U.S. at 450 ("It goes without saying that federal courts must vigilantly enforce federal law and must not hesitate in awarding necessary relief.")), comity and federalism demand that courts must defer to local officials to implement programs that adhere to the law. *Id.* Therefore, the Court cannot grant Ms. Grayson's request to broaden the AAP to include LMHA's administration of Section 8 vouchers.

The Court's 1985 order implementing the AAP after remand from the Court of Appeals, 1985 U.S. Dist. LEXIS 12980 at 15-29, defines the Plan's objectives in (I)(A) and (B). Succinctly, they are: (1) to reduce racial segregation in LMHA projects, (2) to remedy the effects of past discrimination, and (3) to

assure equal access to housing opportunity without regard to race, color, or national origin. The AAP allowed that the objective of remedying past discrimination would be achieved if all the housing projects were within a narrow band of ratios between minority and non-minority residents (between 72.5% - 77.5% minority and 22.5% - 27.5% non-minority in family housing and between 47.5% - 52.5% minority and 47.5% - 52.5% non-minority in elderly housing (expressed as ratios of 3:1 and 1:1 with plus or minus 2.5% considered on-target)). The first and second objectives merge in the plan; that is, the remedy for past discrimination that caused segregation is, under the plan, to reduce segregation going forward. The third objective is sometimes in tension with the first two because LMHA must exert some influence on residents to get them to move in certain directions based on their race (to end up with evenly desegregated projects). The AAP narrowly walks between these objectives, which are sometimes in tension, dictating how LMHA can allocate its units.

The 1985 order provided for modification by agreement (and the parties are not in agreement) or modification when any party can show that progress is no longer being made under the plan. Therefore, the Court's narrowly defined task is to determine if Ms. Grayson can show that progress is not being made towards achieving these objectives. In support of her position, Ms. Grayson can show that the 3:1 ratio has not been met in all the family housing and the 1:1 ratio has not been met in all the senior housing. She also can show that many individual projects have had some, but not enough, progress towards desegregation.

The ratios (3:1 for family housing and 1:1 for elderly housing) are, to an extent, red herrings. The language of the Court's 1985 order (1985 U.S. Dist. LEXIS 12980 at 16) allows that, "[t]he objective of remedying past discrimination shall be achieved and maintained so long as [the ratios are attained and maintained]." Yet, remedying past discrimination is only one of three discernible objectives of the original plan, and this ratio language does not preclude meeting this objective or the other two objectives by other means. Most importantly, the stipulated facts show that the ratio of non-minorities in the LMHA system has dropped; family housing is now around 21% non-minority and elderly housing is now around 39%

5

non-minority. To compel LMHA to move towards 25% non-minority residents in every family housing project and towards 50% non-minority residents in every elderly housing project may effect the precisely opposite outcome as is desired. Because the wording of the AAP does not strictly bind the Court to those ratios and because the reality has changed, the Court will not require strict adherence to the outdated 3:1 and 1:1 ratios.

As the Court seeks to determine whether progress is being made towards the plan's objectives, it must employ a method of measurement. Many ways of measuring desegregation success may exist, but two measures are worth noting. The first measure is ratios (although not the outdated ratios); in a perfectly desegregated public housing system, the ratios in each location would be the same as the ratios in the overall system. That is, if non-minorities made up 20% of the residents in the overall system, then one view of desegregation would hold that each project would have 20% non-minority residents and 80% minority residents. This method of measuring is reflected in the Court's 1985 order noting that desegregation will be considered achieved when the ratios are 3:1 and 1:1 (the then-accurate reflection of the makeup of the LMHA population at large). Another measure is whether any applicant can live wherever he desires, without regard to his race. This, of course, is both a measure of desegregation and a worthy goal of desegregation, but itself may lead to more segregation (that is, if individuals use their freedom to choose locations where their own race predominates). Further, practicality hampers this method; in Lucas County, there is an extensive waiting list for public housing. When a resident does not get into his desired location, it may be a reflection of that resident's need for immediate housing more than a poor reflection on desegregation efforts. For example, a minority applicant may not end up living in a predominantly non-minority location because his strong need for housing left him with no other choice than to take the first available unit rather than waiting months or years for an opening in his desired location. This, then, reflects the sad reality of a heavily burdened public housing system in general, not that system's ability to desegregate its properties.

Because of the complex realities, the Court has not discovered – and the parties have not suggested – a better measuring device than examining the contrast between the overall ratios and the ratios in each location. This carries with it the risk that it could motivate LMHA to "teach to the test," taking steps necessary to bring the ratios in line at the expense of other objectives. Yet, as was the case in 1985 and is still the case today, courts like tangible, quantifiable measuring tools and checking the ratios grants exactly that. Even if ratios are a good measuring tool, the 1985 ratios (3:1 and 1:1) are no longer a fair measure of success. The parties have stipulated that today family locations are 20.6% non-minority and elderly locations are 29.1% non-minority. To grade LMHA on whether they met the long-outdated 3:1 and 1:1 ratios would be unfair and is not required by the text of the 1985 order for a number of reasons, including the fact that LMHA is not asking the Court to deem the desegregation task complete.

Ms. Grayson lists four projects that were nearly all minority when they began and today remain between 88% and 95% minority. She says, "[t]he projects that LMHA built for black people are still the projects for black people." Doc. 269 at 8. LMHA notes that it is in the process of tearing down and rebuilding three of these four projects. Ms. Grayson also points to two other projects that began with lopsided ratios and have only made modest progress in the last 23 years. LMHA counters that it has made significant progress in moving ratios at many of its projects, including the six that Ms. Grayson uses to illustrate her point. Not achieving a perfect balance indicates desegregation is a task complicated by many realities, LMHA says, and does not indicate that it is not making progress.

Since Ms. Grayson has taken on the burden of showing that progress is not being made and is attempting to do so by sampling the changes in ratios in certain projects, and since LMHA is answering with a different interpretation of the same data, the Court will analyze that data more thoroughly. If proper desegregation is achieved by moving every project's ratio towards the overall system's ratio, then any given project is, by definition, more segregated the further it moves from the system-wide ratio. Tracking how far each project is from desegregation is possible by measuring the difference between the system's

7

ratio (plus or minus 2.5%) and the project's ratio. Using the data stipulated by the parties, each project's points away from the system-wide ratio can be calculated in 1989 and 2011:

Elderly Housing Projects

| Project | 1989 System-wide non-minority: 59.4% (in 1983) Range: 56.9 – 61.9 | | 2011 System-wide non-minority: 29.1% Range: 26.6 – 31.6 | |
|---|---|---|---|---|
| | Percent non-minority | Points away from range | Percent non-minority | Points away from range |
| Harry Hansen (007) | 64.5 | 2.6 | 25.0 | 1.6 |
| Speiker Terrace (009) | 87.5 | 25.6 | 39.6 | 8 |
| Vistula Manor (012) | 55.3 | 1.6 | 27.0 | 0 |
| Glendale Terrace (013) | 81.4 | 19.5 | 38.3 | 6.7 |
| Oak Grove Elderly (014) | 25.0 | 31.9 | 50.0 | 18.4 |
| Richmar Manor (015) | 65.9 | 4 | 64.6 | 33 |
| Parqwood Apartments (020) | 9.3 | 47.6 | 11.3 | 15.3 |
| Flory Gardens (021) | 27.3 | 29.6 | 24.4 | 2.2 |
| Teneyck Tower (030) | 26.2 | 30.7 | 24.6 | 2 |
| Robert Dorrell (032) | 65.0 | 3.1 | 44.0 | 12.4 |
| Ashley Arms (038) | 17.9 | 39 | 17.1 | 9.5 |
| | | | | |
| **Total points away from range** | | **235.2** | | **109.1** |

8

Family Housing Projects

| Project | 1989 System-wide non-minority: 21.2% (in 1983) Range: 18.7 – 23.7 | | 2011 System-wide non-minority: 20.6% Range: 18.1 – 23.1 | |
|---|---|---|---|---|
| | Percent non-minority | Points away from range | Percent non-minority | Points away from range |
| Brand Whitlock Ext (002) | 3.6 | 15.1 | 4.4 | 13.7 |
| Ravine Park Village (003) | 17.3 | 1.4 | 35.4 | 12.3 |
| Albertus Brown (004) | 0 | 18.7 | 8.1 | 10 |
| Port Lawrence Homes (005) | 0 | 18.7 | 11.8 | 6.3 |
| Birmingham Terrace (006) | 18.5 | 0.2 | 34.5 | 11.4 |
| Brand Whitlock (008) | 1.1 | 17.6 | 5.1 | 13 |
| Pulley Homes (010) | 4.5 | 14.2 | 28.9 | 5.8 |
| Northern Heights 17 (017) | 14.3 | 4.4 | 20.7 | 0 |
| Northern Heights 19 (019) | 6.7 | 12 | 9.1 | 9 |
| Elmdale Courts (023) | 17.9 | 0.8 | 20.6 | 0 |
| Scattered Sites 28 (028) | 0 | 18.7 | 17.4 | 0.7 |
| John Holland (031) | 7.5 | 11.2 | 9.5 | 8.6 |
| Oak Grove Rental (036) | 3.3 | 15.4 | 45.8 | 22.7 |
| Jade Estates (041) | 17.0 | 1.7 | 19.1 | 0 |
| Turnkey County Willow Bend (044) | 12.5 | 6.2 | 12.5 | 5.6 |
| Weiler Homes (001) | 29.2 | 5.5 | 22.8 | 0 |
| Devonshire (042) | 29.5 | 5.8 | 32.2 | 9.1 |
| Marsrow Acres (043) | 33.3 | 9.6 | 40.0 | 16.9 |
| Houck Town Homes (049) | No data | No data | 20.0 | Not calculated |
| McClinton Nunn (011) | 0.8 | 17.9 | 11.7 | 6.4 |
| 201-Scattered Sites Zone 1 / Scattered Sites 233 | 8.3 | 10.4 | 0 | 18.1 |
| 202-Scattered Sites Zone 2 / 222 Scattered Sites | 40.0 | 16.3 | 28.6 | 5.5 |
| 203-Scattered Sites Zone 3 / 223 Scattered Sites | 40.0 | 16.3 | 14.3 | 3.8 |
| 204-Scattered Sites Zone 4 / 213 Scattered Sites | 32.9 | 9.2 | 23.5 | 0.4 |
| 205-Scattered Sites Zone 5 / 211 Scattered Sites | 31.1 | 7.4 | 25.8 | 2.7 |
| 206-Scattered Sites Zone 6 / 212 Scattered Sites | No data | No data | 10.5 | Not calculated |
| 206-Scattered Sites Zone 6 / 213 Scattered Sites | No data | No data | 12.5 | Not calculated |
| **Total points away from range** | | **254.7** | | **182.0** |

9

A sum of the points away from the system-wide ratio for both family housing and elderly housing demonstrates that LMHA is making some progress towards desegregation (significant progress in elderly housing, moderate progress in family housing). This has answered, in the negative, the question Ms. Grayson presented. That is, Ms. Grayson has not shown that progress is not being made towards desegregation because the numbers show that between 1989 and 2011, LMHA made some progress. Some progress is the opposite of no progress and no further analysis is needed of the stipulated data. Ms. Grayson's motion to modify the AAP must be denied because she cannot meet the Court's 1985 standard for modification, namely, showing that progress toward the goal of desegregation is not being met.

The Court's application of a specific mathematical formula used to analyze Ms. Grayson's contention that progress is not being made towards desegregation does not change the criteria established to alter the AAP. The criteria to modify the AAP in the future remains as the Court established it in 1985: "The Plan may be modified at any time by agreement of all the parties hereto, or when, upon motion of any party at any time, it shall be made to appear that progress is not being made towards achieving the objectives of the Plan." 1985 U.S. Dist. LEXIS 12980 at 16.

Even though Ms. Grayson has not carried the burden of showing progress is not being made under the AAP, she has shown that the AAP is not well suited to contemporary realities. The 3:1 and 1:1 ratios are long outdated. Furthermore, the practical application of waiting lists, resident preference, and LMHA's shifting focus (to Section 8 and to rebuilding troubled projects) likely means that LMHA could act in a completely fair, non-discriminatory, and non-segregationist manner and still never reach the point where every project's ratio was within 2.5% of the system-wide ratio. Most importantly, Ms. Grayson may soon be able to show LMHA's progress to be plateaued using the Court's analysis and comparing more recent years rather than the 22 year span the Court used based on the stipulated data. All this leaves the situation ripe for Ms. Grayson and LMHA to collaborate on a revised AAP that addresses the need to continue the

housing projects move toward desegregation while accounting for the modern realities and the experience gained by implementing the AAP for more than two decades. If the parties consent, the Court will assist in settlement negotiations.

For the reasons stated in this memorandum opinion, the plaintiffs' motion to alter the Affirmative Action Plan (Doc. 231) is denied.

IT IS SO ORDERED.

                                            s/ *David A. Katz*
                                            DAVID A. KATZ
                                            U. S. DISTRICT JUDGE